Slip Op. 20-108

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

CHANGZHOU TRINA SOLAR ENERGY CO.,
LTD., and TRINA SOLAR (CHANGZHOU)
SCIENCE & TECHNOLOGY CO., LTD.,

               Plaintiffs,

CANADIAN SOLAR INC., *ET AL.*,

               Plaintiff-Intervenors,

      v.

UNITED STATES,

               Defendant,

SOLARWORLD AMERICAS, INC.,

               Defendant-Intervenors.

</td><td>

Before: Jane A. Restani, Judge

Consol. Court No. 17-00198

</td></tr>
</table>

## OPINION

Dated: August 4, 2020

[Commerce's Second Remand Redetermination in the Third Administrative Review of the Countervailing Duty Order pertaining to photovoltaic cells from the People's Republic of China is sustained.]

Robert G. Gosselink, Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs and Defendant-Intervenors Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd.

Craig A. Lewis, Hogan Lovells US LLP, of Washington, D.C., for Consolidated Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.

Jeffrey S. Grimson, Sarah M. Wyss, and Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, D.C., for Plaintiff-Intervenors  Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., Canadian Solar (USA) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., and CSI Solar Manufacture Inc.

<u>Tara K. Hogan</u>, Assistant Director and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office, Civil Division, U.S. Department of Justice, of New York, N.Y. With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director. Of counsel on the brief was <u>Paul Keith</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Timothy C. Brightbill</u> and <u>Laura El-Sabaawi</u>, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor SolarWorld Americas, Inc.

Restani, Judge: This action concerns the United States Department of Commerce's ("Commerce") second remand redetermination filed pursuant to the court's order in <u>Changzhou Trina Solar Energy Co. v. United States</u>, Slip Op. 19-137, 2019 WL 5856438 (CIT Nov. 8, 2019) ("<u>Changzhou Trina II</u>"); <u>see</u> <u>Final Results of Redetermination Pursuant to Court Remand</u>, ECF No. 135-1 (Feb. 28, 2020) ("<u>Second Remand Results</u>").

In <u>Changzhou Trina II</u>, the court determined that an additional remand was necessary for Commerce to further explain several of its decisions in the underlying review and subsequent remand. Specifically, the court again remanded for Commerce to explain and/or reconsider: (1) whether respondents benefitted from the People's Republic of China's ("PRC") Export Buyer's Credit Program ("EBCP"), (2) whether Commerce should continue to use the United Nations' Comtrade data in arriving at a benchmark for aluminum extrusions, (3) whether Commerce should use the IHS data alone in arriving at the benchmark for solar glass or whether it should reopen the record, (4) whether Commerce correctly disregarded Canadian Solar's import pricing data of polysilicon as a "tier one" metric under 19 C.F.R. § 351.511(a)(2) due to purported market distortion, and (5) whether the provision of electricity for less than adequate remuneration ("LTAR") was a specific, and thus countervailable, subsidy.

## BACKGROUND

The court presumes familiarity with the facts of this case as discussed in its prior opinions, <u>Changzhou Trina Solar Energy Co. v. United States</u>, 352 F. Supp. 3d 1316 (CIT 2018)

("Changzhou Trina I") and Changzhou Trina II, and thus recounts relevant facts only as necessary. This matter involves a challenge by plaintiffs and defendant-intervenors Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd. (collectively, "Trina"); consolidated plaintiffs BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd. (collectively, "BYD");[1] and plaintiffs and plaintiff-intervenors Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., Canadian Solar (USA) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., and CSI Solar Manufacture Inc. (collectively, "Canadian Solar") against Commerce's remand redetermination in the Third Administrative Review of Commerce's Countervailing Duty Order pertaining to photovoltaic cells from the People's Republic of China ("PRC"). SolarWorld Americas, Inc. ("SolarWorld") is a defendant-intervenor.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii)(2012). Commerce's second remand redetermination will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States, 968 F. Supp. 2d 1255 (CIT 2014) (citation and quotation marks omitted).

---

[1] As in Changzhou Trina I and Changzhou Trina II, BYD does not meaningfully present its own arguments, but rather incorporates by reference several arguments made by Trina and Canadian Solar. See BYD's Comments on the Final Remand Redetermination, ECF No. 143 (April 6, 2020). The court acknowledges BYD's brief and will not make further reference to it.

## DISCUSSION

### I.   Export Buyer's Credit Program

In <u>Changzhou Trina II</u>, the court held that Commerce had again failed to demonstrate that the use of adverse facts available ("AFA")[2] to find that respondents benefitted from the EBCP was warranted because the cooperating respondents' proffered evidence of non-use was unverifiable. <u>Changzhou Trina II</u>, at *3–*5. On remand, the court stated that Commerce and interested parties should collaborate and attempt to find a way for Commerce, absent full cooperation from the PRC, to verify whether respondents benefited from the program. <u>Id.</u> at *4. Should that process prove unsuccessful, and should Commerce continue to rely on AFA, the court ordered Commerce to further consider and explain its sources of information to which it is drawing an adverse inference. <u>See id.</u> at *5 (noting that relying on allegations in the petition alone without apparent corroboration was problematic).

In its second redetermination, Commerce maintains that further attempts to verify non-use of the program would be futile without cooperation from the GOC. <u>Second Remand Results</u> at 11–12. Commerce insists that it "lacks a comprehensive understanding of how the EBCP functions," and that it is unable to differentiate "ordinary commercial loans from EBCP-supported loans in the books and records of the respondents' U.S. customers, or to differentiate disbursements of funds to the respondents themselves." <u>Id.</u> at 11. Rather than attempt suggested ways forward offered by the court or discuss potential alternatives with respondents, Commerce, under protest, has accepted respondents' claims of non-use and removed the AFA rate from the calculation. <u>Id.</u> at 12.

---

[2] If a respondent fails to cooperate to the best of its ability, Commerce may, in certain circumstances, "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." <u>See</u> 19 U.S.C. § 1677e(b). Commerce refers to this as relying on "adverse facts available" or "AFA."

Canadian Solar asserts that the removal of the AFA rate is supported by substantial evidence, but disagrees with Commerce's claim that verification is unlikely to yield useful information. Canadian Solar Comments on Final Remand Redetermination at 30, ECF No. 140 (Apr. 6, 2020) ("Canadian Solar Br."). Although it agrees with the result, Trina contends that Commerce failed to fully comply with the court's remand as Commerce did not "undertake any steps to attempt verification" and thus "denie[d] respondents a meaningful opportunity to generate an accurate and complete record." Comments of Plaintiffs Trina on Second Remand Redetermination at 2–7, ECF No. 141 (Apr. 6, 2020) ("Trina Br."). Commerce solicited limited information regarding the EBCP as part of the remand redetermination process but did not, Trina argues, afford it an opportunity to provide additional information demonstrating its affiliate's borrowing activity during the period of review. Id. at 5–6. Trina, however, argues that because Commerce did not maintain the AFA rate, the issue is likely moot. Id. at 7–8. SolarWorld disagrees with Commerce's decision to find non-use of the EBCP. Rather than make any new argument on this point, SolarWorld incorporates by reference its comments made following Commerce's initial results and first remand redetermination. See SolarWorld's Comments on the Results of Second Remand Redetermination at 1–2, ECF No. 144 (Apr. 6, 2020) ("SolarWorld Br.").

In response, the government says that Commerce understood the court's order to attempt verification as predicated on a desire to "avoid unnecessarily impacting cooperating parties." Defendant's Response to Comments on Remand Redetermination at 10–11, ECF No. 149 (May 14, 2010) ("Gov. Br."). It claims that interested parties had an opportunity to submit new information regarding the EBCP, but agrees with Trina that the issue is nonetheless moot. Id. at 10–11. In reply, Trina disagrees with the government's contention that it was able to provide additional information to Commerce and argues that submitting unsolicited factual information is

prohibited by the applicable regulation. <u>Trina Reply</u> at 1 n.1, 2–3, ECF No. 152.

The government overstates the opportunity Commerce afforded interested parties to submit additional documentation on their usage or non-usage of the EBCP. <u>See</u> <u>Gov. Br</u>. at 10–11. Although Commerce did permit interested parties the opportunity to respond to documents it placed on the record, parties were only allowed to "comment and submit new factual information regarding the [documents Commerce placed on the record]." <u>Placing Documents on the Record</u>, Sec. Rem. P.R. 5–9 (Dep't Commerce Jan 3, 2020). Accordingly, it appears that interested parties were limited as to the documents they could submit without violating regulatory limits on the submission of new facts. <u>See</u> 19 C.F.R. § 351.302(d)(1)(i)-(ii). The removal of the AFA rate, however, has mooted any issues that would have otherwise resulted from Commerce's failure to allow respondents to submit additional documentation supporting their claims of non-use.  <u>See</u> <u>NEC Corp. v. United States</u>, 151 F.3d 1361, 1369 (Fed. Cir. 1998) (noting that mootness occurs when "parties lack a legally cognizable interest in the outcome.") (citing <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969)); <u>see also</u> <u>Calderon v. Moore</u>, 518 U.S. 149, 150 (1996) ("[F]ederal courts may not give opinions upon moot questions or abstract propositions.") (citation and quotation marks omitted).

Although the court stated that "[o]n remand, the parties should discuss potential ways forward and Commerce should request records that may answer the question of EBCP use from respondents, and, if necessary, their importers," Commerce has chosen a different path. <u>Changzhou Trina II</u>, at *4. Rather than attempt an alternative method of verifying respondents' claims of non-use, Commerce has chosen to simply accept those claims. The choice is materially similar to Commerce's decision in <u>Jiangsu Zhongji Lamination Materials Co. v. United States</u>, Slip Op. 20-39, 2020 WL 1456531, (CIT 2020). There, as here, the court remanded for Commerce to confer

with interested parties on ways to verify whether parties had benefitted from the EBCP and "contemplate a solution to the impasse." <u>Id.</u> at *2. Rather than contemplate possible ways to verify the plaintiff's submissions of non-use, in that case Commerce simply decided to accept the plaintiff's submissions of non-use, claiming an inability to verify.[3] <u>Id.</u> Here, Commerce continues to insist that without a full explanation of how the EBCP operates, verification is impossible. <u>See</u> Second <u>Remand Results</u> at 10–11. Although Commerce acknowledged the court's suggested means to potentially conduct verification, apparently these suggestions were in Commerce's estimation a non-starter in view of the Government of the PRC's ("GOC") refusal "to provide Commerce with its 2013 administrative rules governing the program as well as a list of correspondent banks involved in the transactions." <u>See</u> Second <u>Remand Results</u> at 11. Rather than attempt to devise a way to avoid unnecessarily punishing cooperating parties for the GOC's noncompliance, Commerce is steadfast that without full GOC participation, there is no way forward. Although the court acknowledges that Commerce's verification concerns in view of the 2013 revisions to the EBCP are not completely unfounded, the court cannot conclude that verification is impossible, particularly in view of Commerce's failure to pose even the most basic questions regarding the borrowing practices of the relevant parties.

Nevertheless, as noted in the court's previous opinion, during the second administrative review Commerce had accepted similar certifications of non-use as sufficient evidence of non-use. <u>See</u> <u>Changzhou II</u>, at *2 n.5 (citing <u>Changzhou I</u>, 352 F. Supp. 3d at 1324); <u>see also</u> <u>Decision Memorandum for the Preliminary Results of the Administrative Review of the Countervailing</u>

---

[3] Trina submitted a certification of non-use for its sole U.S. customer. <u>See</u> <u>Changzhou I</u>, 352 F. Supp. 3d at 1324 n.4. Here, as in <u>Jiangsu</u>, Canadian Solar did not submit certifications for every customer, but for most. <u>See</u> <u>id.</u>; <u>see also</u> <u>Jiangsu</u>, at *3 n.3. Commerce does not appear to have addressed this issue at the administrative level.

<u>Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,</u>
<u>from the People's Republic of China; 2014</u>, at 31 n.154, C-570-980, P.R. 221 (Dep't Commerce
Dec. 29, 2016). Commerce's reversion to its prior practice is not an impermissible course of action
here. Commerce typically has discretion in deciding whether to verify factual information, and no
party contends verification was required in this instance. <u>See generally</u>, 19 C.F.R. § 351.307
(regulation discussing Commerce's verification of information). As in <u>Jiangsu</u>, "the court did not
direct this result; Commerce chose it." <u>Jiangsu</u>, at *3. Commerce did not confer with the parties as
the court said that it should, but the court does not find that Commerce's decision to accept the
certifications of non-use amounts to noncompliance with the remand. The court sees no purpose
in continuing to remand for further development of the facts.

## II.     Use of IHS data in Computing a Benchmark for Aluminum

The court held that Commerce's decision to average both IHS and Comtrade data for
benchmark aluminum extrusions was unsupported by substantial evidence. In <u>Changzhou Trina</u>
<u>I</u>, "the court conclude[d] that Commerce's decision to average the Comtrade and IHS datasets
without properly considering whether the Comtrade data was too flawed to be probative of the
world market price for the input at issue renders the decision unsupported by substantial
evidence." <u>Changzhou Trina I</u>, 352 F. Supp. 3d at 1332–33. Commerce had averaged the two
datasets due to its preference for monthly data provided by Comtrade and data specific to solar
panels provided by IHS. <u>See id.</u> at 1331–32. Finding problems with this approach because of the
over inclusiveness of the Comtrade data, the court remanded the case to Commerce "with
instructions either to use solely the IHS dataset in its calculation of the appropriate benchmark or
else explain why the inclusion of the Comtrade data does not produce a fatally inaccurate result."
<u>See id.</u> at 1333.

Following the first remand, Commerce continued to average the Comtrade and IHS datasets. See Changzhou Trina II, at *6. Commerce justified this decision as necessary because Comtrade was "the only data on record that captures monthly-price fluctuations." Changzhou Trina II, at *6. The court in Changzhou Trina II, however, found that Commerce had "failed to address the court's concerns that the monthly fluctuations evinced by the Comtrade data might be caused by fluctuations in the price of other products encompassed in the Comtrade headings unrelated to solar frames." Id. at *6. Commerce did not, in the court's view, "adequately account[] for 'factors affecting comparability'" as required under 19 C.F.R. § 351.511(a)(2)(ii). Id. at *7. The court held that Commerce's decision to continue to use the Comtrade data because of its preference for monthly values was unreasonable and remanded the issue to Commerce, stressing that "[a] preference for monthly values cannot overcome data that does not reasonably relate to the product at issue." Id.  The court instructed Commerce to either use the IHS data alone to develop a benchmark or demonstrate that the merchandise included in the Comtrade data is "sufficiently comparable to solar frames." Id.

On second remand, Commerce states that the record does not contain enough information to adequately address factors affecting comparability in the Comtrade data. Second Remand Results, at 12; see also Gov. Br. at 12. While restating its preference to use data that "captures monthly price fluctuations," Commerce concluded that it was "not possible to demonstrate that the monthly price fluctuations reflected in the Comtrade data are driven by variations in solar frame prices." Second Remand Results, at 12. As a result, pursuant to the court's instruction in Changzhou Trina II, Commerce relies exclusively on IHS data as a benchmark for aluminum extrusions and has revised its calculations and rates accordingly. Second Remand Results, at 12–13.

Both Trina and Canadian Solar agree with Commerce's use of IHS data and its recalculation of the benchmarks. Canadian Solar Br. at 2; see also Trina Br. at 2, 9. SolarWorld objects, arguing that Commerce's exclusive reliance on the IHS data is erroneous and that Comtrade data is "sufficiently comparable to solar frames." SolarWorld Br. at 2. SolarWorld does not put forward anything new to demonstrate that the Comtrade data is not "grossly overinclusive." [4] Changzhou Trina II, at *7; see also Changzhou Trina I, 352 F. Supp. 3d at 1334–35; Gov. Br. at 12.

Commerce's determination is consistent with the directions given in Changzhou Trina II and is supported by substantial evidence as outlined in both Changzhou Trina I and Changzhou Trina II. As noted previously, the IHS data is an average annual figure specific to aluminum frames. Changzhou Trina I, 352 F. Supp. 3d at 1331. There is no statutory or regulatory obligation to use monthly data, despite Commerce's preference for it. Id. at 1332. Because the IHS data is specific to the inputs used by the parties, it is probative of the world market price at issue here. Relying on it alone meets the comparability requirements of 19 C.F.R. § 351.511(a)(2)(ii) and is in accordance with Commerce's obligations under the regulations. Changzhou Trina I, at 1332; see also 19 C.F.R. § 351.511(a)(2)(ii). The court sustains Commerce's decision to use IHS data as a benchmark for aluminum extrusions.

## III.    Use of PV Insights data in Computing a Benchmark for Solar Glass

As with the data used for setting the benchmark for aluminum extrusions, in Changzhou Trina I and Changzhou Trina II, the court held that Commerce's decision to average Comtrade

---

[4] See SolarWorld Br. at 2. The basis of its argument rests on a Federal Circuit decision previously distinguished by the court in Changzhou Trina II. See Changzhou Trina II, at *7, n.12 (discussing the irrelevance of SolarWorld Americas, Inc. v. United States, 910 F.3d 1216, 1223 (Fed. Cir. 2018) to this case).

and IHS data for solar glass was unsupported by substantial evidence. In <u>Changzhou Trina I</u>, the court stated that because "Commerce did not inquire into whether the fluctuations in the Comtrade data were due to solar glass rather than other merchandise contained in the HTS headings" the court could not be reasonably assured that the Comtrade data did not "create the appearance of fluctuations in the solar glass market where none actually exist." <u>Changzhou Trina I</u>, 352 F. Supp. 3d at 1334–35. Finding that "Commerce did not sufficiently determine the adequacy of these datasets or explicate their comparability," the court concluded that "Commerce failed to meaningfully assess the reliability of the Comtrade data and included it despite indications that it is overinclusive in regards to the types of glass included in the data, underinclusive in failing to include solar glass-producing countries, and by failing to assess whether the monthly fluctuations were due to price variability of solar glass or merely related to other merchandise contained in the HTS headings at issue." <u>Id.</u> The court remanded the case to Commerce and stressed the importance of accounting "for factors affecting comparability." <u>Id.</u> at 1335 (citing 19 C.F.R. § 351.511(a)(2)(ii)). The court instructed Commerce to either use the IHS data alone in developing a benchmark for solar glass or "address the court's concerns as to the Comtrade data and explain why its inclusion is appropriate." <u>Id.</u>

On first remand, Commerce continued to average the Comtrade and IHS datasets, claiming that its use of Comtrade data was necessary because it was the only data on the record that provided evidence of monthly fluctuations. <u>See</u> <u>Changzhou Trina II</u>, at *8. The court again found the Comtrade data to be "fatally overinclusive of non-solar glass and underinclusive of data from the countries with major solar glass producers" to derive a benchmark supported by substantial evidence. <u>Id.</u> at *9. The court further opined that the IHS data actually undermined the Comtrade data. <u>See id.</u> at *8. The court again remanded the case, directing Commerce to

either use the IHS dataset alone to calculate a solar glass benchmark or to reopen the record to

identify "a dataset that is both specific to solar glass and computed on a monthly basis" and then

use that dataset to compute the benchmark. Id. at *9.

On second remand, Commerce reopened the record and sought data that was both

"specific to solar glass and reported on a monthly basis." Gov. Br. at 13; see also Second

Remand Results, at 13. Upon Canadian Solar's submission of two new datasets, Commerce

decided to exclusively use PV Insights data because it was within the period of review, "specific

to solar glass and reported on a monthly basis," thus making it superior to all other datasets on

the record. Gov. Br. at 13; see also Second Remand Results, at 13, 33. According to the record,

PV Insights is "a solar photovoltaic research firm." Second Remand Results, at 13. Canadian

Solar and Trina both support Commerce's reliance on this data to calculate a revised benchmark

for solar glass. Canadian Solar Br. at 2; see also Trina Br. at 2, 9. Canadian Solar further states

that the IHS data "corroborates [ ] PV Insights methodology . . . indicating that these data are

specific to solar glass." Canadian Solar Responsive Comments on Final Remand

Redetermination at 8, ECF No. 150 (May 14, 2020).

SolarWorld objects and contends that Commerce's reliance on PV Insights is incorrect.

SolarWorld Br. at 2. The basis of its objection is that PV Insights is "unreliable because they lack

an identifiable methodology" and therefore, "it is unclear whether these data truly represent

global prices." Id.

Commerce considered SolarWorld's concerns but determined that the data was reliable.

Gov. Br. at 13–14.[5] Commerce concluded that the PV Insights data "represents the best available

---

[5] See also Second Remand Results at 33–34 (The PV Insights data "appears to be the result of
market research intended to provide accurate, for-purchase, benchmarking information to
participants in the solar market so they can effectively conduct business."). Commerce further

information on the record to measure the adequacy of renumeration for the provision of solar

glass." Second Remand Results at 33. In support, Trina argues that SolarWorld lacks any basis

for its contention that PV Insights data is unreliable and that the information on the record not

only shows the reliability of PV Insights but also that Commerce was reasonable in exclusively

relying on this data for benchmarking solar glass. Trina Reply at 4–6.

   The court agrees. SolarWorld has not put forward anything on the record that contradicts

Commerce's determination that PV Insights is reliable and its use is consistent with the

requirements for comparability under 19 C.F.R. § 351.511(a)(2)(ii). Although the court

understands SolarWorld's concerns regarding the transparency of PV Insights collection of data,

the court is also mindful that it may not substitute its own judgment for that of Commerce where

Commerce "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" See Motor

Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Automobile, 463 U.S. 29, 43

(1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

   Commerce has done so here. SolarWorld's conclusory statements concerning PV Insights

collection methodology is not enough to demonstrate a fatal flaw in Commerce's reasoning.

Although the PV Insights data collection methodology may not be a model for clarity, it is not so

suspect that Commerce's reliance on it is unsupported by substantial evidence. Commerce

considered the relevant factors, including monthly data that was specific to solar glass as well as

SolarWorld's concerns. The court concludes that Commerce's determination was a reasonable

---

found that PV Insights data "appears to be treated as reliable information by the relevant industry
for the POR." Second Remand Results at 34. SolarWorld does not dispute either of these points.

one and thus sustains its determination to use the PV Insights data to set a benchmark for solar

glass.

IV.    **Commerce's Rejection of Canadian Solar's Import Pricing Data in Computing a Benchmark Price for Polysilicon**

In setting the benchmark price for polysilicon, Commerce has consistently rejected

Canadian Solar's proffered data. See Changzhou Trina I, 352 F. Supp. 3d at 1336–37; Changzhou

Trina II, at *9. Commerce reasoned that it could not accept Canadian Solar's import data as a tier

one metric, see 19 C.F.R. § 351.511(a)(2)(i),[6] because of the GOC's participation in the polysilicon

market and the resulting effect on import prices. See Changzhou Trina II, at *9. Accordingly,

Commerce resorted to a tier two metric pursuant to 19 C.F.R. § 351.511(a)(2)(ii). See id. The court

held that Commerce's determination was unsupported by substantial evidence because it appeared

that the GOC had influence over only a small portion of the polysilicon market generally, and

Commerce did not point to data showing how this could properly lead to distortion in the solar-

grade polysilicon industry specifically. See id. at *9–10. On remand, Commerce was instructed to

use Canadian Solar's data as a tier one metric or otherwise sufficiently explain how the "GOC's

participation in the solar-grade polysilicon industry renders [that] data unreliable." Id. at *10.

On remand, Commerce has reopened and supplemented the record with documents it

argues show that in addition to the GOC's ownership interest in the domestic polysilicon industry,

the GOC has engaged in other market-distorting practices that depress the price of solar-grade

---

[6] A tier one metric is a price based on a "market-determined price for the good or service resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). In the absence of a tier one metric, Commerce resorts to a tier two metric and "will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii); see also Guangdong Wireking Housewares and Hardware Co. v. United States, 900 F. Supp. 2d 1362, 1381–82 (CIT 2013) (describing Commerce's practice).

polysilicon. See Second Remand Results at 17–21. Specifically, Commerce contends that the

GOC's policy of export taxes on domestically-produced polysilicon, involvement in contracts with

foreign manufacturers of polysilicon, and other government policies in the production of

polysilicon depress import prices such that Canadian Solar's data is not reliable as a tier one metric.

See id. at 17–22.

Canadian Solar contends that, despite the new documents placed on the record,

Commerce's decision to reject its import data remains unsupported by evidence and unlawful.

Canadian Solar Br. at 20–29. It additionally states that Commerce has still failed to show that the

GOC's participation in the solar-grade polysilicon market was substantial enough to lead to

distortion. Id. at 20–25. Further, it argues that Commerce improperly used adverse facts available,

although Commerce claims that it did not. Id. at 25–27, 29. Finally, Canadian Solar states that

Commerce relied on outdated information. Id. at 27–29. In response, the government argues that

Commerce reasonably determined that the polysilicon market was distorted. Gov. Br. at 14–21. It

also rejects the contentions that Commerce resorted to adverse facts available and that Commerce

relied on outdated information. Id. at 18–20.

Contrary to Canadian Solar's apparent argument, GOC management or ownership of a

substantial amount of the polysilicon market is not a threshold requirement for Commerce to find

market distortion. Commerce understands that "unless [a] government provider constitutes a

majority or, in certain circumstances, a substantial portion of the market," price distortion "will

normally be minimal." Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,377 (Dep't

Commerce Nov. 25, 1998). The court also acknowledges, however, that other kinds of interference

with the market can similarly skew the prices of a good or service such that Commerce can

properly disregard actual transactions in favor of a world market price. See 19 C.F.R. §

351.511(a)(2)(i)–(ii). In addition to considering the GOC's control over the production of a small percentage of polysilicon, Commerce has offered additional evidence of the GOC's involvement in the market in ways that sufficiently support Commerce's finding that Canadian Solar's import data is too distorted to use as a tier one metric. See Reopening the Record and Opportunity to Comment, Sec. Rem. P.R. 10 (Dep't Commerce Jan. 7, 2020) ("Additional Polysilicon Documents").

Commerce argues that a confluence of central government policies has resulted in downward pressure on the domestic price of polysilicon, which in turn depresses imports that must compete with domestic products. See Second Remand Results at 18–21. Commerce now explains the significance of documents placed on the record and how they influenced its distortion finding. See id.; see also Changzhou Trina II, at *9 n.16 (noting additional documents cited by Commerce without explanation of how these documents influenced its decision). For instance, Commerce cites a World Trade Organization ("WTO") Panel Report finding that the GOC imposed a 15% export duty on silicon metal in 2009 inconsistent with WTO member obligations. See Second Remand Results at 18; see also China–Measures Related to the Exportation of Various Raw Materials, WT/DS394/R, WT/DS395/R, WT/DS398/R (5 July 2011) (appellate body report) ("WTO Panel Report") ("WTO Panel Report"). Commerce reasonably argues that this export duty[7] leads to "downward pressure on Chinese domestic prices for all types of polysilicon."

_____

[7] In other investigations Commerce has similarly found that export duties lead to price depreciation rendering domestic prices and imports unreliable as tier one metrics. See Second Remand Results at 36–37, 37 n.154 (citing Biodiesel from Argentina: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination, in Part, 82 Fed. Reg. 40,748 (Dep't Commerce Aug. 28, 2017), and accompanying Preliminary Determination Issues and Decision Memorandum at 31, unchanged at the final determination; Biodiesel from the Republic of Indonesia: Preliminary Affirmative Countervailing Duty Determination, 82 Fed Reg. 40,746 (Dep't Commerce Aug. 28, 2017), and

Second Remand Results at 19. Further, Commerce added documents to the record reflecting the GOC's intervention policies in the solar industry, including polysilicon.[8] See Additional Polysilicon Documents. Although Canadian Solar submitted documentation that it argues undermines Commerce's finding that import prices are altered by the GOC's solar policies, Commerce's decision was nonetheless supported by substantial evidence. See Canadian Solar Letter,re: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Responsive Comments and New Factual Information on Polysilicon, Sec. Rem. P.R. 14, Sec. Rem. C.R. 5 (Jan. 17, 2020) ("Canadian Solar's Polysilicon Letter"). Commerce is correct that even Canadian Solar's proffered evidence appears to indicate that the GOC is directly negotiating price commitments with companies seeking to export into the PRC. See Second Remand Results at 19 (citing Canadian Solar's Polysilicon Letter at 6). As a whole, there is sufficient record evidence to support Commerce's finding of market distortion and rejection of Canadian Solar's import data in the light of that distortion.

Because the GOC did not have information on solar-grade polysilicon, Commerce relied on facts otherwise available in determining that tier one metrics were distorted and therefore unreliable. See Second Remand Results at 15. Canadian Solar incorrectly contends that Commerce is using adverse facts available. Canadian Solar Br. at 25–27, 29. Although Commerce's distortion finding adversely impacts Canadian Solar, that does not necessarily equate to an application of adverse facts available.

accompanying Preliminary Determination Issues and Decision Memorandum at 17, unchanged at the final determination.)

[8] As noted by Canadian Solar, the policy goals detailed in the newly submitted documents are rather general. See Canadian Solar Br. at 28. The documents do support, however, that the GOC is particularly interested in efforts to support the solar industry and in particular polysilicon. See Additional Polysilicon Documents, at Attach. 1.

Finally, although some of Commerce's evidence is dated before the period of review, Canadian Solar offers insufficient proof that the market conditions changed such that the information is outdated. See id. at 27–28. Specifically, Canadian Solar argues that it proffered evidence that lower-priced imports caused a depression in the domestic market. Id. Commerce considered Canadian Solar's evidence and found causation to be the opposite in that depressed domestic prices drove down the price of imports. See Second Remand Results at 41. The court will not substitute its judgment for that of Commerce when its reading is reasonable, as it is here, even if a contrary reading of the evidence presented is theoretically possible. See State Farm, 463 U.S. at 43. Accordingly, Commerce's decision to disregard Canadian Solar's input data as a tier one metric and rely on tier two data is sustained.

V.   **Commerce's Specificity Finding Regarding the Provision of Electricity for Less than Adequate Remuneration**

In its initial determination, Commerce found that the GOC's subsidization of electricity was specific and countervailable. See Changzhou Trina I, 352 F. Supp. 3d at 1340–41 (citing Decision Memorandum for Final Results and Partial Rescission of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2014, at 40–42 (Dep't Commerce July 10, 2017) ("I & D Memo"). In Changzhou Trina I, the court held that Commerce had "failed to explain the particular facts as to which it was drawing an adverse inference and how that analysis subsequently results in a finding of specificity under one of the criteria listed in 19 U.S.C. § 1677(5A)." Id. at 1341–42. On first remand, Commerce found, by drawing an adverse inference, that "the program is limited to a group of enterprises or industries and is thus de facto specific, in the absence of complete information from the GOC." Final Results of Redetermination Pursuant to Court Remand at 68, ECF No. 103-1 (Dep't Commerce Apr. 25, 2019) ("First Remand

Results"). In Changzhou Trina II, the court concluded that Commerce had identified potential

"material gaps in the record" caused by the GOC's non-cooperation. Changzhou Trina II, at *11.

The court remanded again, however, for further explanation of Commerce's "reasoning under the

statutory steps for drawing adverse inferences to fill record gaps." Id.

Rather than further explain its finding that the subsidization of electricity is specific solely

because it is limited to certain industries, Commerce has changed course and issued a finding of

regional specificity pursuant to 19 U.S.C. § 1677(5A)(D)(iv). See Second Remand Results at 22–

24. Commerce determined that "in so far as the varying prices [among provinces] are set by

authorities of the central government in Beijing, and in so far as the GOC is unable to demonstrate

that such variances are in accordance with market principles or cost differences, there is in fact a

regionally specific subsidy program, because the central Beijing authority is setting different prices

in different provinces without explanation." Id. at 22. In rendering this finding, Commerce drew

an adverse inference based on the unexplained differential pricing of electricity among provinces

and the central government's National Development and Reform Commission's ("NDRC") role

in setting electricity prices. Id. at 23–24.[9]

In the current proceeding, Canadian Solar asserts that Commerce's determination is

unsupported by substantial evidence and not in accordance with law. Canadian Solar's Br. at 2–

20. Canadian Solar contends that by substituting a theory of regionally specific subsidization for

Commerce's previous theory of industry-specific subsidization, Commerce violated the court's

---

[9] As noted in Changzhou I, Commerce computed the benchmark for electricity by selecting "the
highest rate schedule on record for each reported category." Changzhou I, 352 F. Supp. 3d at
1341. That decision was sustained in Changzhou I and is not now before the court. Id. at 1343.

order[10] and its determination amounts to an impermissible post-hoc rationalization. Id. at 3–7.

Canadian Solar avers that Commerce's use of adverse facts available was unlawful and produced

a vague finding of regional subsidization. Id. at 7–11. Notably, Canadian Solar argues that

Commerce has failed to identify that any particular region is receiving electricity for LTAR. See

id. at 11–15. Additionally, Canadian Solar contends that Commerce failed to demonstrate the

presence of the solar industry within a subsidized province. Id. at 16–20. Going further, Canadian

Solar asserts the impossibility of regional specificity, claiming that "the record illustrates that the

solar cells industry itself is not isolated in a designated geographical region," and that many

producers are located in the provinces with the highest electricity rates, the number ultimately

selected as the benchmark. Id. at 18–19.

The government asserts that Commerce's application of AFA complied with the court's

order. Gov. Br. at 21. In responding to Canadian Solar's allegation that Commerce's

determination of specificity was excessively vague, the government avers to the impossibility of

rendering a precise determination due to GOC non-compliance. Id. at 25–26. The government

asserts that there need not be a single geographic region receiving the subsidy, nor must a

region's costs be the lowest for a subsidy to exist. Id. at 26. The government argues that

Commerce properly identified gaps in the record (unsubmitted provincial price proposals,

missing descriptions of the cost elements and price adjustments discussed with the NDRC, and a

lack of province-specific explanations linking particular costs to retail prices), explained the

---

[10] Canadian Solar also asserts that Commerce did not address its failure to provide documents it
previously relied on, specifically the supportive documentation listed in the Initiation Checklist,
see Changzhou Trina II, at *11, as required by the remand order. See Canadian Solar Br. at 6.
The court merely noted that Commerce had not provided this documentation in its submissions
to the court. See Changzhou Trina II, at *11. Commerce has now supplemented the record with
those documents. See Joint Appendix for Comments on Second Remand at Attach. III, ECF No.
158 (May 28, 2020).

relevance of such gaps, and described how it reached its regional specificity determination based

on record evidence. Id. at 21–22. The government also asserts that Commerce's adoption, on

second remand, of a regional specificity finding in lieu of industry specificity is consistent with

the court's order. Id. at 23–24. The government contends that Commerce complied by providing

supporting documents from the Initiation Checklist and setting forth its reasoning. Id. at 24–25.

        As a preliminary matter the court addresses Canadian Solar's contention that following

the second remand Commerce acted impermissibly by shifting its rationale for a finding of

specificity from industry specific to geographically specific subsidization. Canadian Solar's Br.

at 3–5. In making this argument Canadian Solar reads Olympic Adhesives, Inc. v. United States

899 F.2d 1565 (Fed. Cir. 1990) to require consistency between the rationales asserted by an

administrative agency on remand. See id.

        Canadian Solar's reliance upon Olympic is mistaken. In Olympic, the Federal Circuit

addressed a discrepancy between the rationale proffered by the ITA within the administrative

record and the arguments it set forth before the court. Olympic Adhesives, 899 F.2d at 1572

(noting the shift between the ITA's reasoning in a notice of final determination and the agency's

brief). Put simply, the court in Olympic did not examine an agency's change in decision

following a court remand. Therefore, Olympic cannot be read for the general proposition that

such changes are impermissible.

        As observed by the Federal Circuit, "limited remands that restrict Commerce's ability to

collect and fully analyze data on a contested issue" are "generally disfavor[ed]." Changzhou

Wujin Fine Chemical Factory Co. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012); see

also Am. Silicon Techs. v. United States, 334 F.3d 1033, 1039 (Fed. Cir. 2003) ("By sharply

limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from

undertaking a fully balanced examination that might have produced more accurate results.").

Consistent with the normal preference of the Federal Circuit, the court's second remand order

only required that "Commerce should expressly set forth its reasoning under the statutory steps

for drawing adverse inferences to fill record gaps." Changzhou Trina II, at *11. Despite

Canadian Solar's contention, the express language of the order did not bind Commerce to any

theory and Commerce's subsequent reliance upon a theory of regional specificity does not

conflict with or exceed the bounds of the remand order. Here, Commerce was allowed to revisit

its determination based on record evidence. The court did not issue narrow remand instructions.

See Royal Thai Government v. United States, 850 F. Supp. 44, 51 (CIT 1994) (rejecting

Commerce's change in rationale after the court directed Commerce to limit itself "to the

evidence and analysis underlying the agency's [prior] decision."). Thus, the operative questions

are whether Commerce sufficiently explained its rationale and whether sufficient evidence

supports that determination.

     In Changzhou Trina II, the court held that "Commerce has identified potentially-material

gaps in the record" that could allow it "to rely on facts otherwise available and draw adverse

inferences based on non-cooperation." Changzhou Trina II, at *11; see also RZBC Group

Shareholding Co. v. United States, 100 F. Supp. 3d 1288, 1300–01 (CIT 2015) (Commerce is

permitted to draw an adverse inference in determining specificity when the GOC failed to

sufficiently answer Commerce's inquiries.). Additionally, as Commerce asserts, the record

indicates that the missing information would help to clarify the basis for regional variability in

electrical rates. See Second Remand Results at 23–24; see also GOC Initial CVD Questionnaire

Response, at 95–100, P.R. 100–102, C.R. 16–18, 20 (May 3, 2016).

Commerce noted two factual bases for a determination of specificity: (1) unexplained regional price variability and (2) central government action via the NDRC. Second Remand Results at 23-24. Applying AFA, Commerce reasoned that this variability was the result of a regionally specific policy of subsidization coordinated through the NDRC. Second Remand Results at 24 ("[A]s AFA, we infer… that the NDRC is the authority providing the subsidy. Moreover, the schedules submitted by the GOC constitute a clear factual basis for the inference that the NDRC has subsidized electricity consumers in certain regions by arbitrarily setting different prices across the provinces."). As noted in Changzhou II, documents submitted by the GOC support Commerce's inference that the NDRC "maintains some input over provincial electricity pricing," and that adjustments made by the NDRC may not comport with market principles. Changzhou II, at *11. This, combined with unexplained price variability among provinces, sufficiently supports Commerce's determination that the subsidy is regionally specific pursuant to 19 U.S.C. § 1677(5A)(D)(iv).

Canadian Solar's arguments regarding the supposed vagueness of Commerce's determination of specificity and the failure to identify certain facts[11] are unavailing given Commerce's proper use of adverse inferences here. The record indicates that "the GOC refused to answer questions related to regional electrical differences, including differences between industries." I & D Memo at 41 (emphasis added); see also Second Remand Results at 44–47 (describing how the GOC's failure to comply prevented Commerce from determining the exact

---

[11] Canadian Solar argues that Commerce was required to: (1) determine the region subsidized, (2) identify the benefitting enterprises or industries within the subsidized region, and (3) find that the solar industry operated within a subsidized region. See Canadian Solar Br. at 9–20. Commerce reasonably determined that the GOC's noncooperation made these determinations impossible. See Second Remand Results at 44–47.

reason for price variation). By insisting on precise explanations, Canadian Solar would require

Commerce to do that which the GOC's non-compliance made impossible; proffer a nuanced

specificity analysis. Additionally, in finding the provision of electricity to be a regional subsidy,

Commerce was not further required to demonstrate that the subsidy was limited to the solar

industry as Canadian Solar claims. See Canadian Solar Br. at 16–20.

The statute describes a regional subsidy to exist "[w]here a subsidy is limited to an

enterprise or industry located within a designated geographical region," 19 U.S.C. §

1677(5A)(D)(iv). In interpreting this part of the statute "any reference to an enterprise or industry

is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises

or industries." 19 U.S.C. § 1677(5A)(D). Once Commerce makes a finding of regional

specificity, all enterprises or industries within that region could reasonably be understood to be

"a group of such enterprises or industries," obviating any purported need for Commerce to make

an additional showing that a regional subsidy benefitted a particular industry. See id. This

understanding of the statute is confirmed by the statement of administrative action which

provides that "subsidies provided by a central government to particular regions (including a

province or a state) are specific regardless of the degree of availability or use within the region."

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316,

vol. 1, at 932 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4244 ("SAA").[12] Notwithstanding

---

[12] "The statement of administrative action approved by the Congress under section 3511(a) of
this title shall be regarded as an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and this Act in any judicial
proceeding in which a question arises concerning such interpretation or application."19 U.S.C. §
3512(d). The court in Royal Thai cited the SAA for the proposition "no additional showing of
specificity" is required if Commerce finds that a central government is providing subsidies based
on region. See Royal Thai, 441 F. Supp. 2d at 1358 n.5; see also Samsung Electronics Co. v.
United States, 973 F. Supp. 2d 1321, 1328-29 (CIT 2014) (citing Royal Thai to support a finding
that a subsidy conditioned on geographical region satisfied 19 U.S.C. § 1677(5A)(D)(iv)).

that Commerce was stymied by the GOC in determinizing whether the solar industry was

disproportionately receiving subsidized electricity, after reasonably determining that the

provision of electricity was a regional subsidy provided by the central government (via the

NDRC), Commerce did not need to make such a finding. See Royal Thai Government v. United

States, 441 F. Supp. 2d 1350, 1358 (CIT 2006) (differential pricing of electricity based on

regional location was enough, without more, to demonstrate regional specificity).[13]

     Commerce identified the gap in the record, noted the factual bases it relied upon, and

explained the adverse inference it drew based on those facts. Commerce's determination is

reasonable based on the record and supported by substantial evidence. The court sustains

Commerce's finding that the provision of electricity for less than adequate remuneration is a

regionally specific subsidy.

## CONCLUSION

     For the foregoing reasons, Commerce's Second Remand Results are sustained. Judgment

will enter accordingly.

                                          __/s/ Jane A. Restani_____
                                          Jane A. Restani, Judge

Dated: August 4, 2020
      New York, New York

---

[13] Similarly, Canadian Solar's contentions that some solar industries paid the highest electricity rates and that the solar industry is not isolated in a single region, see Canadian Solar Br. at 18–19, are immaterial to a finding of regional specificity. Further, that some cell producers may not have paid the lowest electricity rates does not disprove Commerce's regional specificity determination. Commerce's specificity finding simply was not based on disproportionate use by a given industry.